[No. AO14757. First Dist., Div. Two. Jan. 4, 1984.]

PUBLIC UTILITIES COMMISSION, Plaintiff and Respondent, v.
ENERGY RESOURCES CONSERVATION AND DEVELOPMENT
COMMISSION, Defendant and Appellant;
PACIFIC GAS AND ELECTRIC COMPANY,
Real Party in Interest and Respondent.

PACIFIC GAS AND ELECTRIC COMPANY,
Plaintiff and Respondent, v.
ENERGY RESOURCES CONSERVATION AND DEVELOPMENT
COMMISSION, Defendant and Appellant.

438

---

**COUNSEL**

John K. Van de Kamp, Attorney General, R. H. Connett, Assistant Attorney General, and Mary E. Hackenbracht, Deputy Attorney General, for Defendant and Appellant.

Janice E. Kerr, William N. Foley and James T. Quinn for Plaintiff and Respondent Public Utilities Commission.

John B. Gibson and David C. Gilbert for Real Party in Interest and Respondent and Plaintiff and Respondent.

OPINION

KLINE, P. J.—

INTRODUCTION

California Energy Resources Conservation and Development Commission (Energy Commission) appeals issuance by the San Francisco County Superior Court of a peremptory writ of mandate commanding the Energy Commission to cease its exercise of jurisdiction over certain electric transmission lines proposed to be built by respondent Pacific Gas and Electric Company (PG&E).

The Energy Commission contends that its jurisdiction over electric transmission lines from a powerplant extends to the point on the interconnected transmission system to which power is actually delivered. It terms this point the "actual functional point of delivery of power." Respondents PG&E and the California Public Utilities Commission (CPUC) disagree, contending that the Energy Commission's jurisdiction extends only to the first point of junction between the powerline emanating from the powerplant and the interconnected transmission system.

The Energy Commission is a five-member body created pursuant to the Warren-Alquist State Energy Resources Conservation and Development Act (Pub. Resources Code, §§ 25000-25968) (Warren-Alquist Act or Act).[1] Enacted in 1974, the Warren-Alquist Act charged the Energy Commission with responsibility for establishing a state energy policy and for insuring adequate electricity supplies with minimum adverse effect on the state economy and environment. (See §§ 25001, 25004, 25309, 25500, 25500.5, 25523, and 25524.) Among its many duties, the Energy Commission is vested with exclusive authority to certify sites and related facilities (§ 25500). "Facility" is defined in the Act as "any electric transmission line or thermal powerplant, or both electric transmission line and thermal powerplant, regulated according to the provisions of this division." (§ 25110.) Section 25107 defines "electric transmission line" as "any electric powerline carrying electric power from a thermal powerplant located within the state to a point of junction with any interconnected transmission system. . . ."[2]

---

[1] All statutory references are to the Public Resources Code unless otherwise indicated.

The parties agree that section 25107 defines the extent of the Energy Commission's jurisdiction over transmission lines. Jurisdiction over transmission lines beyond a point of junction with any interconnected transmission system lies with respondent CPUC. (Pub. Util. Code, § 761 et seq.) However, the parties disagree as to the meaning of section 25107. The trial court agreed with respondents PG&E and CPUC that the statute refers to the first point of junction between the transmission line and the interconnected transmission system.

The Energy Commission, relying upon a formal opinion of the Attorney General (60 Ops.Cal.Atty.Gen. 239 (1977)), contends that the lower court erred in interpreting section 25107 to preclude it from exercising jurisdiction over any proposed transmission lines beyond the first point of junction of the line from the powerplant with any interconnected transmission system and from utilizing "functional point of delivery" and "basic purpose" tests to determine its jurisdiction.

The Energy Commission also requests this court to confirm its own determination that the functional points of actual delivery of power by the proposed transmission lines (and thus the extent of the commission's jurisdiction) are the Newark substation, the Tesla substation and the Newark-San Mateo transmission line.

Contending that section 25107 is ambiguous, the Energy Commission urges this court to utilize extrinsic aids, arguing that cases arising under the Federal Power Act should guide our interpretation of that section. The Energy Commission further argues that in adopting the Warren-Alquist Act the Legislature intended to replace a fragmented system of regulation with a unified energy policy and that such intent is best implemented by utilization of a "functional" jurisdiction test which, as applied here, assertedly provides authority to the Energy Commission to regulate the lines in question.

---

[2]Public Resources Code section 25107 provides in its entirety: " 'Electric transmission line' means any electric powerline carrying electric power from a thermal powerplant located within the state to a point of junction with any interconnected transmission system. 'Electric transmission line' does not include any replacement on the existing site of existing electric powerlines with electric powerlines equivalent to such existing electric powerlines or the placement of new or additional conductors, insulators, or accessories related to such electric powerlines on supporting structures in existence on the effective date of this division or certified pursuant to this division."

PG&E and the CPUC contend in response that the plain meaning of the statute precludes adoption of a "functional" test and that Federal Power Act cases do not provide guidance, as the purpose of the Warren-Alquist Act differs from that of the Federal Power Act.

They maintain that a powerline cannot serve as both a primary "radial" line and a part of the interconnected transmission system and that the proposed "functional" test is inconsistent with the engineering realities of power transmission. Respondents point to the legislative history of section 25107 as demonstrating the Legislature's intent that the CPUC retain jurisdiction over the interconnected transmission system and assert that the Legislature has recognized the CPUC to be an effective regulator in this area.

Finally PG&E and the CPUC urge that adoption of the "functional" test would necessarily lead to regulatory uncertainty and fragmentation as neither regulated utilities, government agencies, nor the public could be certain in any given case where jurisdiction lay until the Energy Commission made its determination.

We conclude with respondents PG&E and the CPUC that the plain meaning of the statute, supported by the legislative history of the Act as well as by relevant policy considerations, compel affirmance of the judgment.

I.

On April 20, 1978, pursuant to section 25500 et seq., PG&E filed with the Energy Commission a "Notice of Intention To Seek Certification for Pittsburg Power Plant Units 8 and 9." (NOI.)

PG&E proposed construction of a 1,600-megawatt combined cycle powerplant known as Pittsburg units 8 and 9 near PG&E's existing Pittsburg units 1 through 7. To accommodate the power from the proposed plant, PG&E proposed to build approximately 3.7 miles of new radial transmission line from units 8 and 9 to the switchyard of existing Pittsburg units 1 through 7 powerplant.[3]

The NOI also disclosed that transmission capacity beyond the Pittsburg switchyard would be increased by modifications to the existing system and by the construction of various segments of new 230kV lines; including ap-

---

[3]The parties do not dispute that the 3.7-mile segment, described in the NOI as "stage 1," is within Energy Commission jurisdiction. The dispute in this case concerns the lines leaving the existing Pittsburg switchyard in interconnected system "stages 2 and 3."

proximately 71 miles of transmission lines in new and existing rights of way to the Newark and Tesla substations and to a point on the Newark to San Mateo transmission line. The latter 71 miles of proposed line and modifications, sometimes referred to as the stage 2 and 3 lines, are the subject of this dispute.

Following hearings before a committee of the Energy Commission and before the full commission, the Energy Commission in April 1979 asserted jurisdiction over the proposed lines and ordered PG&E to submit additional information about the proposed lines.

In the opinion accompanying the order, the Energy Commission interpreted its transmission line jurisdiction to extend to the "actual functional point of delivery of the power" from the thermal powerplant to the interconnected transmission system. Applying this test to the evidence regarding the proposed transmission lines, the Energy Commission found that the "functional" points of delivery of power from units 8 and 9 to the interconnected transmission system were the Newark and Tesla substations and the Newark-San Mateo transmission line.

PG&E and the CPUC each filed actions in the superior court challenging the commission's decision. On May 28, 1980, the trial court issued a peremptory writ of mandate commanding the Energy Commission to set aside its April 1979 order, to cease the exercise of jurisdiction over transmission lines beyond the Pittsburg switchyard, the first point of junction, and to cease use of the "functional point of delivery" and "basic purpose" tests in determining its jurisdiction.

II.

■, ■ The central issue in this case is the proper interpretation of section 25107, defining "electric transmission lines" over which the commission has jurisdiction. Such interpretation is, of course, a question of law. (*Gibbons & Reed Co.* v. *Dept. of Motor Vehicles* (1963) 220 Cal.App.2d 277, 285-286 [33 Cal.Rptr. 688].) ■ "Where the facts essential to the determination of such a legal issue are not in conflict, the reviewing court is not bound by the trial court's resolution. [Citations.]" (*Goddard* v. *South Bay Union High School Dist.* (1978) 79 Cal.App.3d 98, 105 [144 Cal.Rptr. 701].)

■ The Energy Commission asserts that the statute is ambiguous as there may be more than one point at which a transmission line intersects the interconnected transmission system. Therefore, it urges the court to

construe the section in the light of extrinsic evidence which assertedly demonstrates that the "functional" test best carries out the legislative intent.

■ In ascertaining the intent of the Legislature, the court must first look to the words of the statute. " '[C]ourts are bound to give effect to statutes according to the usual, ordinary import of the language employed in framing them. [Citations omitted.] While a court may also properly rely on extrinsic aids in ascertaining the intention articulated in a statute, the court should first turn to the words of the statute to determine the will of the Legislature. [Citation omitted.] A court should not, moreover, add to or alter the words of the statute to accomplish a purpose that does not appear on the face of the statute or from its legislative history if the words of the statute are clear; nor should the court seek hidden meanings not suggested by the statute or by the available extrinsic aids. [Citations omitted.]' " (*Madrid* v. *Justice Court* (1975) 52 Cal.App.3d 819, 824 [125 Cal.Rptr. 348], quoting *Rich* v. *State Board of Optometry* (1965) 235 Cal.App.2d 591, 604 [45 Cal.Rptr. 512]; see *Sturgeon* v. *Leavitt* (1979) 94 Cal.App.3d 957, 964 [156 Cal.Rptr. 687].)

■ There is no language whatsoever in the Act or its legislative history which utilizes or refers to a "functional point" of delivery or a "basic purpose" of the lines. The sole witness at the commission hearings, PG&E's transmission system planning engineer, testified that the phrases were not used in planning the transmission grid and that he did not in fact know what they meant.

The "functional test" is derived from cases arising under the Federal Power Act (16 U.S.C. § 791a et seq.) which defines the kind of "project" over which the Federal Power Commission has jurisdiction. Under that analysis, a transmission line's "nature, purpose and function" must be determined. (*Pacific Power & Light Co.* v. *Federal Power Comm'n.* (D.C. Cir. 1950) 184 F.2d 272, 275.) If it will serve principally as a primary line transmitting energy from the powerplant to the interconnected transmission grid, it falls within the commission's jurisdiction. (*Montana Power Co.* v. *Federal Power Commission* (9th Cir. 1940) 112 F.2d 371, 374.) "[T]he test to be applied is that of the basic purpose of the line in relation to other facilities." (*Re Western Massachusetts Electric Co.* (1968) 39 F.P.C. 723, 731.)"

The cases under the Federal Power Act relied upon by the Energy Commission interpret section 201, subdivision (11), of that Act, contained in 16 United States Code section 796(11). That section defines the kind of "project" over which the FPC has jurisdiction, providing in pertinent part that

jurisdiction extends to ". . . the primary line or lines transmitting power [from the hydroelectric plant] to the point of junction with the distribution system or with the interconnected primary transmission system . . . ." Thus, it is urged that "the Federal Power Act confers jurisdiction on the FPC over transmission lines emanating from a hydroelectric powerplant in terms similar to those in the state Energy Act which confer jurisdiction on the Energy Commission over transmission lines emanating from a thermal powerplant within California." (60 Ops.Cal.Atty.Gen., *supra,* at p. 245, fn. omitted.)

While the Federal Power Commission cases cited deal with a statute of similar language, the purpose of the Federal Power Act is materially different from that of the Warren-Alquist Act. ▮▮ ▮▮ Although state courts will look to the federal courts for guidance in interpretation of a new state statute similar in wording *and purpose* to an existing federal statute (see, e.g., *Agricultural Labor Relations Bd.* v. *Superior Court* (1976) 16 Cal.3d 392, 404 [128 Cal.Rptr. 183, 546 P.2d 687]; *Los Angeles Met. Transit Authority* v. *Brotherhood of Railroad Trainmen* (1960) 54 Cal.2d 684, 688-689 [8 Cal.Rptr. 1, 355 P.2d 901]), the disparate purposes of the Federal Power Act and the Warren-Alquist Act convinces us that cases arising under the federal act do not in this case provide appropriate guidance. In determining what lines are primary lines and within the definition of the term "project" for licensing purposes, the FPC seeks to "insure the viability of that project in the event of recapture [by the federal government] pursuant to Section 14 of the Act." (*Re New England Power Co.* (1970) 43 F.P.C. 568, 573.) No such policy underlies the Warren-Alquist Act generally or section 25107 in particular.

Moreover, *Re Georgia Power Co.* (1968) 39 F. P. C. 930, 931-932 [75 Pub. Util. Rep.3d 122, 124], interprets the Federal Power Act language as providing for *one* point of junction. There the FPC stated that "[w]hile the statute does not limit the number of primary lines which may emanate from a project, it does, as Applicant points out in its Motion for Rehearing, provide that there can be but *one point* at which any one of these primary lines connects with a distribution system or an interconnected primary transmission system. Section 3(11) [of the Federal Power Act] is quite specific that it is at this point that the primary line shall terminate. It is, therefore, clear that under Section 3(11) of the Act *a line cannot serve as both a primary line and a part of the distribution system or interconnected primary transmission system.*" (*Ibid.,* italics added.)

In support of its multiple points of junction theory, the Energy Commission relies upon use of the article "a" in the phrase "a point of junction"

as implying that more than one point of junction may exist, one of which is the terminus of the commission's transmission line jurisdiction. Although "a" is defined as an indefinite article used before a noun to indicate non-specific membership in a class or category (see, Webster's New Internat. Dict. (3d ed. 1965 p. 1) it is difficult to conclude that the use of this indefinite article necessarily demonstrates that there may be multiple points of junction or that the conclusion of *Georgia Power* that there may be only one point of junction is inapplicable simply because the statutory language in that case referred to "*the* point of junction." (Italics added.)[4]

The IEE Standard Dictionary of Electrical and Electronics Terms (2d ed. 1977) defines "interconnected system" as "[a] system consisting of two or more individual power systems normally operating with connecting tie lines." (*Id.*, at p. 346.) A "power system" is defined as "[a] group of one or more generating sources and/or connecting transmission lines operated under common management or supervision to supply load." It is conceded, as testified by the only expert to appear at the hearing, that the Pittsburg switchyard marks the point where the lines from Pittsburg units 8 and 9 would meet with and become part of the interconnected system. The power flowing into the Pittsburg switchyard could emanate from several sources in addition to Pittsburg units 1 through 7 or the proposed units 8 and 9. The switchyard and the lines emanating therefrom, including the lines here proposed to be built or modified by PG&E, have a usefulness to the system in addition to that of transporting power from the proposed units 8 and 9.

The Energy Commission does not dispute that the switchyard marks for these lines a point of junction with an interconnected system. Rather, the Energy Commission disputes that this first point of junction marks the limits

---

[4]The analysis contained in the Attorney General's opinion itself, upon which the Energy Commission relies, although concluding that a "functional" test is appropriate, seems to recognize a single point of junction. It refers to "junction" as defined by Webster's New International Dictionary (2d ed., 1961), as ". . . 2. *The* place or point of union, meeting, or junction; . . ." (60 Ops.Cal.Atty.Gen., *supra,* at p. 244, italics added.) It concludes that "under the common usage of the term, a 'point of junction' with an 'interconnected transmission system' would be *the* place where the transmission line originating at the powerplant meets or joins such a system. The technical definition of 'junction' is 'a connection between two or more conductors or two or more sections of transmission line,' [IEE Standard Dictionary of Electrical and Electronics Terms (1972)], while the term 'junction point' or 'node' (two equivalent terms) is defined as 'a terminal of any branch of a network or a terminal common to two or more branches of a network.' [*Ibid.*] A 'terminal' is a point at which two or more elements of an electrical system may be directly connected to one another. [*Ibid.*] Thus, under both the common and the technical definitions, a 'point of junction' with an 'interconnected transmission system' is *the place* where the transmission line originating from the powerplant meets or connects with that system." (*Id.,* at pp. 244-245, italics added.) Thus, the Attorney General's opinion may itself be construed to contemplate that there is but one point of junction with the interconnected transmission system.

of its certification authority relying, in part, upon the opinion of the Attorney General. ■ However, while an apposite Attorney General's opinion is accorded deference by the courts (*Cristmat, Inc.* v. *County of Los Angeles* (1971) 15 Cal.App.3d 590, 593 [93 Cal.Rptr. 325]) it is by no means binding. (*Smith* v. *Anderson* (1967) 67 Cal.2d 635, 641, fn. 5 [63 Cal.Rptr. 391, 433 P.2d 183]; cf. *Sanchez* v. *Unemployment Ins. Appeals Bd.* (1977) 20 Cal.3d 55, 67 [141 Cal.Rptr. 146, 569 P.2d 740].)

■ We believe the plain meaning of the statute is that there is one point of junction between the radial line emanating from the powerplant and the interconnected transmission system. At that point of junction the line is part of the system and cannot simultaneously be both a primary line from a powerplant and part of the interconnected system, as the FPC recognized in *Georgia Power Co., supra,* 39 F.P.C. 930 [75 Pub. Util. Rep.3d 122].

### III.

This interpretation of the statute in accordance with its plain meaning is consistent with the engineering properties of electric transmission lines and systems and the different functions of radial and interconnected transmission lines. As the CPUC points out, there are distinct differences in the operating characteristics of "radial" or "stub" lines and "interconnected" or "system" lines. Radial lines emanate from the powerplant and have only one terminal connected to a transmission system. As stated in the declaration of the only expert witness to testify, the source of power transmitted along a radial line, viz., the powerplant with which it is connected, is always known. Moreover, transmission of power along a radial line is not affected by "load" (i.e., extent of customer use) at any given moment. Only the rate of electric generation occurring at the powerplant can affect the level of power transmitted.

"Interconnected" lines are located within the transmission system and have both their terminals connected to the interconnected system. They can transmit power in two directions. The power transmitted within the interconnected system comes into the system from a number of generating units. Once power enters the system, it is essentially indistinguishable as to its source. The flow of power over the interconnected transmission line changes from moment to moment in amplitude and sometimes in direction and is affected by "load."

Thus, it is reasonable to read the statute in accord with its plain meaning to limit the jurisdiction of the Energy Commission to the junction between the radial line and the interconnected transmission system.

## IV.

Interpretation of section 25107 according to its apparent meaning also makes sense in light of its legislative history and the policies behind the Warren-Alquist Act.

The Energy Commission argues that the legislative intent can best be carried out by application of its "functional test" in determining its jurisdiction over transmission lines. The commission points out that one of the objectives of the Act was to substitute the Energy Commission's certification proceeding for the fragmented regulation of sites and facilities by different local, regional and state agencies. (§§ 25003, 25005, and 25006.) The commission has "exclusive power to certify all sites and related facilities in the state . . . ." (§ 25500; see also §§ 25514, subd. (a)(2), 25542.) The commission's certificate is "in lieu of any permit, certificate, or similar document required by any state, local, or regional agency, or federal agency to the extent permitted by federal law . . . ." (§ 25500.) In addition, the commission contends that a powerplant and transmission line are a rational unit for siting purposes and that the Legislature anticipated that the Energy Commission would conduct a comprehensive review of the project as a whole.

It is true that the hearings that led to enactment of the Warren-Alquist Act reflect concern with the ills of fractionalized regulation in the area of energy policy. But such concern focused upon regulations affecting the siting of powerplants and the need for a unified energy policy with respect thereto. (Hearings on State Energy Policy Before the Subcommittee on State Energy Policy of the Assem. Comm. on Planning and Land Use (1973) part V: Power Plant Siting.) The siting of transmission lines, which is of course primarily determined by the location of powerplants, did not receive much direct attention at the legislative hearings and there was virtually no testimony regarding the siting of transmission lines within an interconnected system.

The language of section 25107 and the absence of any expression of a different purpose in the pertinent legislative history reflect an apparent intent to limit the authority of the Energy Commission over interconnected transmission lines.

As originally proposed, section 25107 gave the Energy Commission wide jurisdiction over all transmission lines by defining "electric transmission lines" as:

"[A]ny electric power line which carries more than 200 kilovolts and all appurtenant facilities thereof, including, but not limited to, switching yards. 'Electric transmission line' does not include any replacement on the existing site of existing facilities with facilities equivalent thereto or the placement of new or additional conductors, insulators, or accessories related thereto on supporting structures in existence on the effective date of this division." (Assem. Amend. to Assem. Bill No. 1575 (1973-1974 Reg. Sess.) Apr. 25, 1973.)

The Energy Commission's jurisdiction over the construction of transmission lines under this definition would have been limited only by the capacity of the line and not by its location, and would have included "all appurtenant facilities . . . [and] . . . switching yards" or substations. Under this version, except for the replacement of existing lines on existing support structures, the commission would have had siting jurisdiction over the construction of all transmission lines of greater than 200 kilovolt capacity anywhere in the state, and over any substations construction in conjunction with such lines.

The first sentence of section 25107 was amended in the assembly on March 28, 1974, to read: " 'Electric transmission line' means any electric powerline carrying electric power from a thermal powerplant to a point of junction with any interconnected transmission system." (Assem. Amend. to Assem. Bill No. 1575 (1973-1974 Reg. Sess.) Mar. 28, 1974.)[5]

The amendments to section 25107 changed the method of limiting the Energy Commission's jurisdiction over new transmission lines from a capacity limitation to a geographic limitation. Amendments also deleted the proposal to confer jurisdiction on the commission over "appurtenant facilities . . . including . . . switching yards." Under the geographic limitation, the Energy Commission has jurisdiction over the construction of any electric powerline—except for the replacement of existing lines on existing supporting structures—beginning at the thermal powerplant associated with the line, and ending at "a point of junction with any interconnected transmission system." (§ 25107) The commission's jurisdiction over such line was further limited to transmission lines carrying power from a thermal powerplant "located within the state." (*Ibid.*)

---

[5]Later amendments to the second sentence of the section substituted the term 'electric powerline' for the term 'facility' and added 'or certified pursuant to this division' to the end of the sentence. (*Ibid.*) On April 4, 1974, section 25107 was further amended in the Senate to insert the phrase 'located within the state' after the term 'thermal powerplant' in the first sentence of the section." (Assem. Amend. to Assem. Bill No. 1575 (1973-1974 Reg. Sess.) Apr. 4, 1974.)

Although the Energy Commission argues that the foregoing amendments were not limitations upon its jurisdiction, but rather changes from a rigid capacity test to a flexible "functional test," it is clear that the amendments in fact placed a geographic limitation upon the Energy Commission's jurisdiction over transmission lines.[6] The adoption of this geographical test evinces a legislative intent that the Energy Commission not possess jurisdiction over lines which are part of the interconnected transmission system itself.

We find support for our view of the Legislature's intent to limit the Energy Commission's jurisdiction over transmission lines in the March 8, 1974, letter of Frederick W. Mielke Jr., chairman of the board of PG&E, to Assemblyman Charles Warren, coauthor of the Act. In pertinent part that letter states: "The definition of 'electric transmission line' (Sec. 25107) should be confined to lines connecting a power plant to a transmission system. The procedures which would be established by the bill are not appropriate for transmission lines and would inhibit rather than enhance our ability to provide adequate service." We consider it significant that the critical amendment changing the limits of the Energy Commission's jurisdiction from a capacity test to a geographical test was adopted on March 28, 1974, shortly after receipt of and in apparent response to this letter.[7]

Considering the different engineering properties of radial and interconnected lines earlier described, and the purpose of the Act, the legislative choice to exclude from Energy Commission jurisdiction lines which are part of the interconnected transmission system was a rational determination.

Limiting Energy Commission jurisdiction over interconnected transmission lines will not significantly hamper the Energy Commission from carrying out its duties and responsibilities under the Act. The commission may still consider the full transmission network in its review of new transmission line or thermal powerplant proposals over which it has jurisdiction. "For example, in considering the relative merits of alternative facility sites proposed in a notice of intention to file an application for certification [§ 25503], the commission might decide to approve certain sites and reject others if the rejected sites would require increased transmission capacity beyond the point of junction with the interconnected system, while the ap-

---

[6]Even the opinion of the Attorney General, although advocating a "functional" test, recognized that "[a]s we have interpreted the act, the vast majority of the state's new transmission facilities will doubtlessly fall outside the commission's jurisdiction." (60 Ops.Cal.Atty.Gen., *supra,* at p. 249.)

[7]We take judicial notice of this letter at the unopposed request of respondent PG&E pursuant to California Evidence Code sections 452, subdivision (h), 455 and 459.

proved proposals would, because of their location in relation to the load and to existing generating plants, reduce power flows on that system. Furthermore, if certification of a new transmission line or thermal powerplant will require construction of transmission lines that will not fall within the commission's certification jurisdiction, the additional lines must be considered part of the "project" for purposes of the California Environmental Quality Act [§ 21000 et seq.; see former Cal. Admin. Code, tit. 14, § 15037] when the commission prepares an environmental impact report on the facility [§ 25519, subd. (c)]. Similarly, the commission may have to consider general transmission arrangements to determine whether approval of a facility would have antitrust implications adverse to the public interest. [Cf., *Northern California Power Agency* v. *Public Util. Com.* (1971) 5 Cal.3d 370 (96 Cal.Rptr. 18, 486 P.2d 1218).] With respect to all such matters, the commission may attach appropriate conditions to its approval of a notice of intent [§ 25514, subd. (d)] or application for certification [§ 25523, subd. (a)] that are based on the consideration of transmission lines not within the commission's certification jurisdiction." (60 Ops.Cal.Atty.Gen., *supra*, 239, 249.)

The Energy Commission argues that respondents' interpretation of the statute as confirmed by the trial court would lead to piecemeal regulation by a variety of local, regional, and statewide agencies, and would enable local jurisdictions to obstruct and delay powerplant transmission line sitings. In this connection, the commission additionally contends that the CPUC, although possessing continuing authority to regulate and control transmission lines with respect to issues of reliability and safety, is not able to effectively regulate siting of transmission lines as the CPUC regulates private and not municipal utilities and because the jurisdiction of the CPUC in many cases is not exclusive but concurrent with local entities. Thus, the Energy Commission argues that if siting jurisdiction for interconnected transmission lines remains with the CPUC, localities will be able to condition, delay, or block transmission facility construction.

It is true that the CPUC has jurisdiction over private utilities and cannot regulate municipal utilities in the absence of specific authorizing legislation (*County of Inyo* v. *Public Utilities Com.* (1980) 26 Cal.3d 154, 166 [161 Cal.Rptr. 172, 604 P.2d 566]; *Orange County Air Pollution Control Dist.* v. *Public Util. Com.* (1971) 4 Cal.3d 945, 953 at fn. 7 [95 Cal.Rptr. 17, 484 P.2d 1361]) and that the CPUC in some circumstances has concurrent jurisdiction with local agencies (*Orange County Air Pollution Control Dist.* v. *Public Util. Com., supra,* at pp. 953-954). However, it is also established that the CPUC has "paramount jurisdiction in cases where it has exercised its authority, and its authority is pitted against that

of a local government involving a matter of statewide concern." (*Id.*, at pp. 950-951; *Harbor Carriers, Inc.* v. *City of Sausalito* (1975) 46 Cal.App.3d 773, 775 [121 Cal.Rptr. 577].)

 The Legislature's confidence in the CPUC's ability to effectively regulate is demonstrated by the broad regulatory authority it would retain even if we were to accept the Energy Commission's "functional" definition. The extensive jurisdiction of the CPUC over transmission systems is not disputed. It is charged with general responsibility for the reliability of such systems. (Pub. Util. Code, § 761.) It exercises jurisdiction over the safety and adequacy of electric powerlines. (Pub. Util. Code, § 8001 et seq.) The CPUC has siting jurisdiction over numerous transmission lines not arguably under the jurisdiction of the Energy Commission (§ 25107; Pub. Util. Code, § 1001) and acts as the lead agency under CEQA for the siting and construction of these other transmission facilities. (CPUC General Order 131-B; Cal. Admin. Code, tit. 20, § 17.1.) The CPUC also retains exclusive jurisdiction over radial lines emanating from a hydroelectric powerplant, as the Energy Commission's jurisdiction extends only to "thermal powerplants" powered by thermal energy and does not include hydroelectric plants. (§§ 25120, 25502.) In addition the CPUC reviews and certifies utility participation in any out-of-state generation facilities and out-of-state transmission line projects.

Even where the Energy Commission concededly has jurisdiction over radial powerlines or powerplants, the CPUC still retains authority to issue a certificate of public convenience and necessity for a site or related electrical facilities, provided that the certificate may not be issued until the utility has obtained a certificate from the Energy Commission. (§§ 25518, 25518.5.)

These areas of undisputed regulation by the CPUC demonstrate legislative recognition that the CPUC is an effective and efficient agency for purposes of regulating interconnected transmission lines. Had the Legislature intended to strip the CPUC of its siting authority over the interconnected transmission system lines it would almost certainly have done so explicitly. Moreover, it is unlikely that the Legislature would have allowed the CPUC to retain extensive authority over transmission facilities if it believed the agency to be ineffective in regulating the same.

As noted earlier, the CPUC retains responsibility for system reliability and safety. (Pub. Util. Code, §§ 451, 761.) Reliability and safety will doubtless be affected by many factors, including the location of transmission lines. Because the CPUC rather than the Energy Commission has the legally mandated duty to conduct ongoing review of system reliability, and because

the location of powerlines is an important component of overall system reliability, exclusion of interconnected transmission line siting from the Energy Commission's jurisdiction is a sensible legislative decision.[8]

Determination of Energy Commission jurisdiction by use of the "functional" definition would result in regulatory fragmentation and uncertainty of the type the Legislature sought to avoid in enacting the Warren-Alquist Act. Under the "functional" definition, the Energy Commission would have jurisdiction over siting and modification for some interconnected transmission lines, while the CPUC would continue to retain jurisdiction for other lines in the same interconnected transmission system, which would result in some instances in lines on opposite sides of the same tower being regulated by different agencies.

Of greater concern is the uncertainty and confusion that would likely result from the Energy Commission's utilization of the "functional" test in defining its own jurisdiction. Such test anticipates a case-by-case determination by the Energy Commission of the extent of its jurisdiction. Until such time as the commission makes that determination in a particular case, which may be long after the administrative process has commenced, neither utilities, state, regional or local agencies, nor the general public will know whether the Energy Commission possesses or is exercising regulatory authority. The attendant delay, expense, and uncertainty might well create regulatory havoc.

In addition, uncertainty as to application of the "functional" test in particular situations is likely to generate challenges to the Energy Commission's designation of the "functional" point of delivery, as the result will frequently depend upon disputed factual determinations.[9] Such jurisdictional challenges would in many instances lead to costly delays in electric transmission line siting.

The uncertainty and instability which would inevitably result from case-by-case application of the "functional" test is inimical to the salutary policy which informs the Warren-Alquist Act.

---

[8]The Energy Commission points out that it does review reliability during the NOI process. (§§ 25511, 25514, subd. (e), 25520, subd. (b).) However, it is the CPUC that thereafter has continuing responsibility for system reliability.

[9]In the instant case, for example, PG&E challenges the Energy Commission's determination that the Newark substation, the Tesla substation, and the Newark-San Mateo line are the "functional" points of the actual delivery of power even accepting the disputed assumption that the functional test applies.

For the foregoing reasons we reject the "functional" point of delivery test sought to be utilized by the Energy Commission in determining its jurisdiction and conclude that the plain language of section 25107 defines the extent of the Energy Commission's jurisdiction over transmission lines as ending at the point where the radial line emanating from the powerplant joins with the interconnected transmission system. In this case that point is the Pittsburg switchyard.

As we have concluded that the trial court was correct in rejecting the formulation of "functional point of actual delivery" as the test for Energy Commission jurisdiction, we need not determine whether substantial evidence supports the Energy Commission's decision that the "functional" point of actual delivery of power from Pittsburg units 8 and 9 would be the Newark substation, the Tesla substation, and the Newark-San Mateo transmission line.

The judgment is affirmed.

Rouse, J., and Smith, J., concurred.