[No. B055524. Second Dist., Div. One. Dec. 31, 1991.]

DEPARTMENT OF WATER AND POWER, CITY OF LOS ANGELES,
Plaintiff and Respondent, v.
ENERGY RESOURCES CONSERVATION AND DEVELOPMENT
COMMISSION, Defendant and Appellant.

**COUNSEL**

William M. Chamberlain, John D. Chandley, Jonathan Blees and Steven M. Cohn for Defendant and Appellant.

James K. Hahn, City Attorney, Edward C. Farrell, Chief Assistant City Attorney, and Stanton J. Snyder, Deputy City Attorney, for Plaintiff and Respondent.

**OPINION**

**ORTEGA, J.**—California Energy Resources Conservation and Development Commission (Energy Commission) appeals from the judgment ordering the issuance of a peremptory writ of mandate commanding the Energy

Commission to cease its exercise of certification jurisdiction over the Harbor Generating Station Repowering Project. We affirm the judgment.

## FACTS AND PROCEDURAL BACKGROUND

Respondent Department of Water and Power of the City of Los Angeles (DWP) owns the Harbor Generating Station (station). The station, which encompasses a 20-acre site in Wilmington, California, provides "voltage support, transmission support, southern system security and emergency support" for the DWP's electrical system.

### A. *South Coast Air Quality Management District Rule 1135*

The station, which was in existence before the Energy Commission's creation, has not previously been subject to the commission's certification jurisdiction. The present certification controversy arose when the DWP selected the station for a repowering project to comply with rule 1135 of the South Coast Air Quality Management District (SCAQMD).

Rule 1135, enacted in August 1989, applies to "all existing, electric power generating steam boiler systems and all affected repowered units and non-combustion resource[s]." Rule 1135 establishes "District-Wide Daily Allowable Emissions" for the DWP's electric power generating steam boiler system, and a schedule for achieving such decreasing emissions rates. Rule 1135 requires in part that the DWP " 'repower at least 240 megawatts of existing steam boilers by December 31, 1993[,] with repowered capacity such that NOx emissions from the repowered unit[s] do not exceed 0.25 pound of NOx per net megawatt hour.' "[1]

### B. *The Repowering Project*

The station (before repowering) contains nine electrical generating units and auxiliary facilities including fuel oil tanks, water tanks, shops, a warehouse, offices, and a substation. The station has two types of generators: Rankine cycle or steam turbine generators (units 1 through 5) which were built during the 1940's, and Brayton cycle or simple cycle gas turbine generator units (units 6 through 9) which were installed in 1972. The repowering project will convert the station over to a combined cycle process which physically combines both Rankine and Brayton cycles in a more efficient system.

---

[1] As used in rule 1135, "NOx emissions" means "the sum of nitric oxides and nitrogen dioxide collectively expressed as nitrogen dioxide."

Units 1 through 5 (before repowering) use natural gas-fired boilers to produce the steam which is transferred to the steam turbines. The steam turbines then use the resultant energy to turn the electrical generators. The steam is condensed back into water and returned to the boilers where the Rankine cycle is repeated.

Units 6 through 9 (both before and after repowering) use fossil fuel-powered engines to produce hot air which carries the heat of combustion to the turbines, which in turn spin the electrical generators.

The parties stipulated below to the specific details of how the station will be converted to a combined cycle system. The oldest units (units 1 and 2) will be dismantled and removed from service.[2] In the space vacated by the removal of units 1 and 2, new generators will be installed to run the repowered unit 5 in a combined cycle system.

The new combined cycle system will be powered by two 80-megawatt combustion turbine generators and two heat recovery steam generators. The repowering project will physically combine the Brayton and Rankine cycles by capturing the otherwise wasted heat exhaust from the two new combustion turbine generators (the Brayton cycle portion of the combined cycle) and using that energy to boil water in the two new heat recovery steam generators. The resulting steam will then be used to drive the steam turbine generators (the Rankine cycle portion of the combined cycle), thereby augmenting the gas turbine generators' output and increasing the station's overall efficiency.

In addition to the new generators, the DWP will supply unit 5 with new "condensate polishers, fuel gas compressor stations, water treatment equipment, and a Selective Catalytic Reduction (SCR) System[.]" And the DWP will either add to or modify unit 5's "auxiliary steam generator, gland steam condensers, vacuum pumps, turbine bypass, exhaust gas stacks, and air filter assemblies."

---

[2]Specifically, unit 1 and 2's "boilers, steam turbine generators, feedwater systems, condensers, auxiliary power, and process controls and instrumentation would be removed; the boiler feed pumps, circulating water pumps, and generation transformers would remain on site unchanged; the exhaust stacks would be removed and replaced with new stacks of a different design; and the equipment foundations would be strengthened."

Parts of units 3, 4, and 5 will be retained for use in the repowered unit 5.[3] Unit 3's "condenser would be used as a bypass for steam from the [heat recovery steam generators] only in the event that both the Unit 4 and Unit 5 steam turbines were inoperative." The units 4 and 5 "steam turbine generator, feedwater system, condensers, auxiliary power, boiler feed pumps, circulating water pumps, generation transformers, foundation, and exhaust stacks would remain on site unchanged[.]" "[T]he only changes to Unit 4 and Unit 5 steam turbines would be to modify the process controls and instruments, the hydraulic controls, and to convert the water seals to steam seals on the steam turbine to receive steam from two Heat Recovery Steam Generator units . . . instead of a boiler."

Other parts of units 3, 4, and 5 will be permanently removed from service. Unit 3's "boiler, steam turbine generator, feedwater system, auxiliary power, process controls and instrumentation, boiler feed pumps, circulating water pumps, generation transformers, foundation, and exhaust stack would remain on site, but would not be used, even in an emergency." And unit 4 and 5's steam boilers "would be permanently removed from service and would not be used, even in an emergency."

Units 6, 7, 8, and 9, which each have a capacity of 19 megawatts and are used for "peaking duty," will not be affected by the repowering project. These units will continue to operate during the repowering project.

In general, the repowering project will affect the station's overall operation as follows: "Over 60 percent of the equipment within the building which contains the steam turbine-generators would be left in place after the repowering. Approximately 95 percent of the square footage of the existing 20-acre facility site would not be changed by the repowering project. [¶] . . . After the repowering project is completed, none of the boilers would operate, and 20 percent of the steam turbine generators (excluding condensers) would operate on a normal basis (40 percent counting the back-up turbine)."[4]

---

[3]As one witness explained it, "In order to enhance the expected reliability of the Rankine cycle portion of the repowered project, LADWP further proposes to maintain the Unit 4 steam turbine generator as a backup in case the Unit 5 machine is unavailable for use; and to have the Unit 3 condenser available for steam bypass in the event both steam turbines are unavailable. Specifically, the Units 1 and 2 boilers, steam turbine generators, condensers, feedwater systems and all controls and auxiliary power systems will be physically removed; Units 3, 4 and 5 boilers and the Unit 3 steam turbine generator will be permanently removed from service; and the Unit 3 condenser will be connected to the steam line from the [heat recovery steam generators] to the Units 4 and 5 steam turbines."

[4]Although the DWP's stated impetus for the repowering project is compliance with an SCAQMD rule, the technical details of how the repowered station will reduce NOx emissions

## C. *The Energy Commission's Jurisdiction*

In 1974, the Legislature enacted the Warren-Alquist State Energy Resources Conservation and Development Act (Pub. Resources Code, § 25000 et seq., hereafter the Act).[5] The Act states that "electrical energy is essential to the health, safety and welfare of the people of this state and to the state economy, and that it is the responsibility of state government to ensure that a reliable supply of electrical energy is maintained at a level consistent with the need for such energy for protection of public health and safety, for promotion of the general welfare, and for environmental quality protection." (§ 25001.) The Act also enunciates a policy and intent to "establish and consolidate the state's responsibility for energy resources, for encouraging, developing, and coordinating research and development into energy supply and demand problems, and for regulating electrical generating and related transmission facilities." (§ 25006.)

■ The Act established the Energy Commission. (§ 25200.) The Energy Commission's five members[6] are responsible for establishing the state's energy policy and "insuring adequate electricity supplies with minimum adverse effect on the state economy and environment. [Citations.]" (*Public Utilities Com.* v. *Energy Resources Conservation & Dev. Com.* (1984) 150 Cal.App.3d 437, 440 [197 Cal.Rptr. 866].)

The Energy Commission's certification jurisdiction is set forth in section 25500. After the effective date of the Act, "no *construction* of any facility or *modification* of any existing facility shall be commenced without first obtaining certification for any such site and related facility by the commission, as prescribed in [the Act]." (§ 25500, italics added.) Section 25500 supplies the Energy Commission with the exclusive power to certify all "sites"[7] and

---

are not relevant to this appeal. The DWP claims it will use "the best available air pollution control technology as defined by the [SCAQMD]."

[5]All statutory references are to the Public Resources Code unless otherwise indicated.

[6]"One member of the commission shall have a background in the field of engineering or physical science and have knowledge of energy supply or conversion systems; one member shall be an attorney and a member of the State Bar of California with administrative law experience; one member shall have background and experience in the field of environmental protection or the study of ecosystems; one member shall be an economist with background and experience in the field of natural resource management; and one member shall be from the public at large." (§ 25201.)

[7]A " '[s]ite' [is] any location on which a facility is constructed or is proposed to be constructed." (§ 25119.)

"related facilities,"[8] "whether a new site and related facility or a change or addition to an existing facility." (§ 25500.)

Section 25500 would require the DWP to obtain the Energy Commission's certification if the Harbor repowering project is found to constitute either the "construction" or the "modification" of a facility. (For the sake of convenience, we hereafter use the shorthand terms "construction jurisdiction" and "modification jurisdiction.")

The Act supplies definitions for both "construction" and "modification." As used in the Act, " 'Construction' means onsite work to install permanent equipment or structure for any facility." (§ 25105.) The term "facility" includes a " '[t]hermal powerplant' . . . with a generating capacity of *50 megawatts* or more . . . ." (§§ 25120, italics added, 25110.)[9]

The term "modification" as used in the Act means "any alteration, replacement, or improvement of equipment that results in a *50-megawatt or more increase* in the electric generating capacity of an existing thermal powerplant . . . ." (§ 25123, italics added.)

D. *The Administrative Hearing*

The DWP maintained at the administrative hearing that the Energy Commission lacked both construction jurisdiction and modification jurisdiction over the repowering project. The Energy Commission staff, on the other hand, contended that both types of jurisdiction were present.

As previously indicated, the parties stipulated to the basic factual details of the repowering project. In addition, the parties stipulated to the electrical generating capacities of the units before and after repowering. The total electrical generating capacity of the entire station (units 1 through 9) before repowering is 449 megawatts. The total generating capacity of the entire station (units 1A, 2A, 4, 5, 6, 7, 8, and 9) after repowering will be 316 megawatts. (Due to the fact that the 76-megawatt capacity of units 6 through

---

[8] A " '[f]acility' [is] any electric transmission line or thermal powerplant, or both electric transmission line and thermal powerplant, regulated according to the provisions of this division." (§ 25110.) A " '[t]hermal powerplant' [is] any stationary or floating electrical generating facility using any source of thermal energy, with a generating capacity of 50 megawatts or more, and any facilities appurtenant thereto. . . ." (§ 25120.)

[9] "Construction" does not include "[t]he installation of environmental monitoring equipment," a "soil or geological investigation," a "topographical survey," "[a]ny other study or investigation to determine the environmental acceptability or feasibility of the use of the site for any particular facility," or "[a]ny work to provide access to a site for any of the [above] purposes . . . ." (§ 25105, subds. (a)-(e).)

9 will remain unchanged, at various places in the administrative record and in this opinion, the repowering project is described as a 240-megawatt project in reference to the capacity of units 1A, 2A, 4, and 5.)

Although the Energy Commission staff stipulated that the total electrical generating capacity of units 1 through 9 before repowering is 449 megawatts, the staff refused to stipulate to include the capacity of units 1 and 2 (72 and 67 megawatts, respectively) in the total. The staff relied upon the undisputed fact that units 1 and 2 were only maintained "on 'cold stand-by' status" because the DWP had previously exchanged their SCAQMD air permits to obtain "offset credits" in upgrading another station. Units 1 and 2 were thus permitted to operate only during emergencies or for periodic serviceability testing. Because of their limited use, the Energy Commission staff contended that the "combined electrical generating capacity of Units 1 and 2 is *zero*." (Italics added.) According to the Energy Commission staff, the station's prerepowering capacity was only 310, rather than 449 megawatts. The DWP, on the other hand, maintained that because units 1 and 2 remained operable, their generating capacity may not be ignored.

In addition to the disagreement over units 1 and 2, the parties also differed on whether the repowering project would result "in a 50-megawatt or more increase in the electric generating capacity of an existing thermal powerplant . . . ." (§ 25123.) This disagreement is central to their opposing views on modification jurisdiction.

### 1. *Modification Jurisdiction*

According to the DWP, the station's repowered 316-megawatt capacity constitutes a 133-megawatt *reduction* if units 1 and 2 are included in the calculation. And even if units 1 and 2 are not included, the station's repowered 316-megawatt capacity constitutes only a 6-megawatt increase over the station's former 310-megawatt capacity (excluding units 1 and 2). The DWP thus maintained there is no modification jurisdiction since the repowering project will not result in a 50-megawatt increase in the station's generating capacity.

But the Energy Commission staff contended that the repowered 240-megawatt capacity of units 1A, 2A, 4, and 5, may not be offset by the loss of 234 megawatts from retiring the old units. The staff stated in its brief: "[T]here is no allowance for such an offset (or subtraction) in the definition of 'modification of an existing facility' in . . . section 25123. Offsetting language is not contained in section 25123, nor does the legislative history of the . . . Act support such an interpretation. . . . Because the 240-MW

combined cycle project would result in a 50-megawatt or more increase in the electrical generating capacity of the existing thermal powerplant, the Commission has jurisdiction over the modification, regardless of any decreases in capacity caused by the retirement or deactivation of other units at the plant."

### 2. *Construction Jurisdiction*

In addition, the Energy Commission staff also contended the Energy Commission has construction jurisdiction over the repowering project. Section 25120 provides that a "thermal powerplant" is "any stationary or floating electrical generating facility using any source of thermal energy, with a generating capacity of 50 megawatts or more, and any facilities appurtenant thereto. . . ." The Energy Commission staff asserted that because the repowered station will be a brand new facility with a generating capacity of 50 megawatts or more, the Energy Commission has construction jurisdiction over the repowering project.

The Energy Commission staff claimed the following factors supported its position on construction jurisdiction: "(1) with the functional removal of the entire source of thermal energy (all five boilers) and four of five steam turbines, the 'existing' power plant no longer exists; [¶] (2) the air permits for [all of] the . . . existing boilers either have been or will be surrendered; [¶] (3) the new power plant will use a different technology (combustion turbines and heat recovery steam generators) for both the source of thermal energy and the principal source of electrical generation than is on site for the existing power plant (boilers and steam turbines); [¶] (4) the new power plant will have a different function (intermediate and base load) than the existing plant (infrequent load following and emergency); and [¶] (5) LADWP's resource planners have consistently treated the Harbor Combined Cycle Plant as a new plant."

In response, the DWP asserted in part that the sole relevant jurisdictional inquiry is whether the repowering project will result in a 50-megawatt or more increase in the station's capacity. The DWP pointed out that "in past cases the *Staff and the Commission have defined generating capacity in past jurisdictional disputes as the total site output.* . . . It is also obvious that the Commission has not adopted an official rule on determining generating capacity because it would deny jurisdiction in some cases and prevent the current capricious case-by-case analysis, which is inimical to the . . . Act. . . ."

### 3. *The Administrative Ruling*

The Energy Commission sided with its staff and determined that the repowering project will result in the construction of a *new* facility with a

generating capacity of 50 megawatts or more. The Energy Commission stated in its written decision: "[T]he Harbor Project is subject to the Commission's jurisdiction because it is undisputed that the project involves the construction of two new combustion turbines with a generating capacity of 160 MW. Regardless of the fact that these turbines are being placed on an existing site and are being incorporated into a new design with some existing equipment, the installation of new generating equipment that allows the production of 50 MW or more of electrical capacity constitutes the construction of a 'facility,' thus falling within the plain meaning of the phrase 'construction of any facility.' " (Fn. omitted.)

The Energy Commission rejected the DWP's position that the "phrase 'construction of any facility' [was] meant to refer only to new facilities on new sites. . . . [I]f the Legislature had intended this result, it would have used the qualified phrase 'construction of any *new* facility' or 'construction of any facility *on a new site.*' "

As an alternative ground for its ruling, the Energy Commission further determined that the repowering project is a modification of an existing facility. Although the Energy Commission conceded that it has "no rules which specifically apply to the calculation of generating capacity in the context of a repowering project," (fn. omitted) the Energy Commission agreed with its staff that the energy capacity of the repowered plant may not be reduced or offset by the energy capacity of the units being retired.[10]

E. *The Superior Court Hearing*

The DWP petitioned for a writ of mandate, which the Los Angeles County Superior Court granted on November 13, 1990. In an eight-page minute order, the superior court thoroughly analyzed the jurisdictional issue and concluded the Energy Commission lacks both construction and modification jurisdiction over the repowering project. Accordingly, the superior court issued a writ of mandate directing the Energy Commission to vacate and set aside its administrative decision and order of July 25, 1990, and to enter a new decision and order stating that it does not have jurisdiction over the repowering project.

With regard to modification jurisdiction, the superior court accepted the DWP's mathematical calculations of the net change in generating capacity

---

[10]In making this determination, the Energy Commission did not explicitly state that units 1 and 2 had *no* electrical generating capacity. However, it is clear that the Energy Commission implicitly adopted its staff's position on this point. In its opening brief on appeal, the Energy Commission stated, consistent with it's staff's position, that "substantial evidence supports the Commission's determination to 'ignore'—more accurately, to treat as separate from the modification, because they are not 'existing' powerplants—the capacity of Units 1 and 2."

resulting from the repowering project. The minute order states in relevant part: "The 50-megawatt increase element is missing regardless of whether the Harbor Generating Station is treated in the aggregate as *one* thermal powerplant, or whether *each individual generating 'unit'* in the Harbor Generating Station is treated as a separate 'thermal powerplant[.'] (Counsel for DWP presented the arithmetic on this point, and the calculation is very simple.)"[11]

In addition, the superior court rejected the Energy Commission's decision to ignore the generating capacities of units 1 and 2. The minute order states in relevant part: "There is nothing in the . . . Act which authorizes ignoring existing capacity in making the [section 25123] amount-of-increase calculation on the theory that capacity not used on a regular basis does not exist. Instead, the only reasonable construction of the statute is to conclude that 'capacity' means 'capacity[.'] Capacity maintained in a standby status is still capacity which can be used if called upon. A capacity need not be used in order to be a capacity. . . ."

With regard to construction jurisdiction, the superior court concluded that the Energy Commission's interpretation would improperly subsume section 25123's 50-megawatt increase test and read it out of the Act. The minute order states in relevant part: "Any 'modification' of an existing powerplant which results in an 'increase' of 50 megawatts must necessarily involve the installation of 50 megawatts or more of generating capacity. Under the Commission's analysis, however, *any* installation of power generating equipment of 50 megawatts or more capacity is subject to [construction] jurisdiction. This would necessarily include all 'modifications[.'] If this were the proper interpretation of the statute, there would be no need for a distinction between 'construction' and 'modification[.']" The minute order further states: "The 'construction of any facility' basis for jurisdiction can be read to apply only to construction of a *new, previously non-existing* facility consistent with the totality of the statute, and it must properly . . . be read that way. This is the apparent reason for the existence of the construction/modification distinction. . . ."

---

[11]The following chart was provided by the DWP in its respondent's brief to clearly illustrate that the repowering project will not result in a 50-megawatt increase even if each unit is treated as a separate powerplant:

| *Present Capacity* | *Future Capacity* | *Result* |
| --- | --- | --- |
| Unit 1-72 M.W. | Unit 1A-80 M.W. | + 8 M.W. |
| Unit 2-67 M.W. | Unit 2A-80 M.W. | + 13 M.W. |
| Unit 3-62 M.W. | zero megawatts | - 62 M.W. |
| Unit 4-86 M.W. | Units 4 & 5-80 M.W. | - 92 M.W. |
| Unit 5-86 M.W. | (Combined Output)" | |

The Energy Commission appeals from the judgment.

## CONTENTIONS ON APPEAL

The Energy Commission contends that (I) its finding of modification jurisdiction was reasonable and is supported by substantial evidence; and (II) its finding of construction jurisdiction was reasonable and is supported by substantial evidence.[12]

## DISCUSSION

### I

The Energy Commission contends that we must defer to its administrative interpretation of sections 25500 and 25123 (citing *Industrial Indemnity Co.* v. *Workers' Comp. Appeals Bd.* (1985) 165 Cal.App.3d 633, 638 [211 Cal.Rptr. 683]), and accept its finding that it has modification jurisdiction over the repowering project under the substantial evidence rule. We disagree.

■ The *"contemporaneous* construction of a new enactment by the administrative agency charged with its enforcement" is entitled to great weight. (*Dyna-Med, Inc.* v. *Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1388 [241 Cal.Rptr. 67, 743 P.2d 1323], italics added.) Since the Energy Commission claims that this is a case of first impression, it cannot seriously contend that its ruling of July 25, 1990, was contemporaneous with the 1974 enactment of sections 25500 and 25123. The Energy Commission's administrative decision, which came 16 years after the Act's passage, is not entitled to great weight. (See *Dyna-Med, Inc.* v. *Fair Employment & Housing Com., supra*, 43 Cal.3d at p. 1389.)

■ Moreover, the final interpretation of a statute is a question of law and rests with the courts. (*Dyna-Med, Inc.* v. *Fair Employment & Housing Com., supra*, 43 Cal.3d at p. 1389; *Public Utilities Com.* v. *Energy Resources Conservation & Dev. Com., supra*, 150 Cal.App.3d at p. 443.) We therefore follow the established principles of statutory construction in construing sections 25500 and 25123.

■ "[O]ur first task in construing a statute is to ascertain the intent of the Legislature so as to effectuate the purpose of the law. In determining such intent, a court must look first to the words of the statute themselves,

---

[12]In order to facilitate our discussion of the issues, we have stated the Energy Commission's contentions in reverse order.

giving to the language its usual, ordinary import and according significance, if possible, to every word, phrase and sentence in pursuance of the legislative purpose. A construction making some words surplusage is to be avoided. The words of the statute must be construed in context, keeping in mind the statutory purpose, and statutes or statutory sections relating to the same subject must be harmonized, both internally and with each other, to the extent possible. [Citations.] Where uncertainty exists consideration should be given to the consequences that will flow from a particular interpretation. [Citation.] Both the legislative history of the statute and the wider historical circumstances of its enactment may be considered in ascertaining the legislative intent. [Citations.] A statute should be construed whenever possible so as to preserve its constitutionality. [Citations.]" (*Dyna-Med, Inc.* v. *Fair Employment & Housing Com., supra,* 43 Cal.3d at pp. 1386-1387.)

With these principles in mind, we turn to the relevant statutes in determining whether the Energy Commission has modification jurisdiction over the repowering project.

Section 25500 provides that the Energy Commission has certification jurisdiction over the "modification of any existing facility." (§ 25500.) Section 25123 explains that " '[m]odification of an existing facility' means any alteration, replacement, or improvement of equipment that results in a 50-megawatt or more increase in the electric generating capacity of an existing thermal powerplant . . . ." (§ 25123.)

The Act's definitions of "facility" and "thermal powerplant" are circuitous. The Act defines a "facility" as any "thermal powerplant" (§ 25110), and then turns around to define a "thermal powerplant" as "any . . . electrical generating *facility* using any source of thermal energy, with a generating capacity of 50 megawatts or more, and any *facilities* appurtenant thereto. . . ." (§ 25120, italics added.)

We hold that "facility" in sections 25500 and 25123, as the term applies here, collectively refers to the entirety of the existing powerplants at the Harbor Generating Station. The plain, commonsense meaning of sections 25500 and 25123 is that any alteration, replacement, or improvement of equipment that results in a 50-megawatt *net* increase in an existing station's total generating capacity is subject to the Energy Commission's certification jurisdiction. Nothing in the statutes authorizes the Energy Commission to ignore a station's former generating capacity in making the section 25123 increase calculation.

By ignoring the station's former generating capacity in this case, the Energy Commission has significantly expanded its modification jurisdiction

to encompass upgrading projects which improve the technology, efficiency, and emissions controls of an older station without causing a 50-megawatt increase in the station's total generating capacity. Such an expansion of jurisdiction contravenes the plain meaning of sections 25500 and 25123. By imposing the threshold 50-megawatt increase requirement, the Legislature clearly did not intend to give the Energy Commission certification jurisdiction over repowering projects, such as this one, which actually *decrease* a station's total generating capacity.

The undisputed evidence in this case plainly demonstrates that the repowering project will decrease the station's generating capacity. Even though the SCAQMD permits for units 1 and 2 were exchanged for another station's offset credits, units 1 and 2 remained operational. Their capacity did not vanish even though they were not regularly operated. Accordingly, their generating capacity was improperly ignored by the Energy Commission in making the section 25123 increase calculation.

■ Moreover, even if the generating capacity of units 1 and 2 is excluded from the section 25123 increase calculation, the repowering project will not result in a 50-megawatt increase in the station's capacity. The station's repowered capacity of 316 megawatts will result in only a 6-megawatt increase over the station's former 310-megawatt capacity.

In addition, even if we viewed each unit as a separate "facility" or "powerplant," we would reach the same result. As properly found by the trial court, the record demonstrates that the repowering project will not result in a 50-megawatt increase even if each unit is treated as a separate powerplant. (*See ante*, fn. 11.)

Although we believe that our statutory interpretation disposes of the issue, we nevertheless address the legislative history issue addressed by the parties, which supports our construction of sections 25500 and 25123. (See *Dyna-Med, Inc.* v. *Fair Employment & Housing Com.*, *supra*, 43 Cal.3d at p. 1393.) As originally proposed, the Act did not include a definition of the term "modification" as used in section 25500. Thereafter, the Legislature adopted section 25123 which defines "modification" in an amendment dated March 28, 1974. ■ By adopting the 50-megawatt increase test in section 25123, the Legislature prohibited the Energy Commission from asserting jurisdiction over any alteration, replacement, or improvement of equipment that does not result in a 50-megawatt increase in an existing station's generating capacity.

We find further support for our view of the Legislature's intent in the March 8, 1974, letter of Frederick W. Mielke, Jr., vice-president and assistant to the chairman of the Pacific Gas and Electric Company, to Assemblyman Charles Warren, coauthor of the Act. (See *Public Utilities Com.* v. *Energy Resources Conservation & Dev. Com.*, *supra*, 150 Cal.App.3d at p. 450.) That letter states in relevant part: "Plant 'modifications' should not be subject to the extensive siting requirements of the bill (Sec. 25500). 'Modification' is nowhere defined. Any external or internal plant adjustment no matter how necessary, even those required to accommodate environmental requirements, could be delayed by the extensive siting process. [¶] . . . The lengthy 'notice' procedure should apply only to new sites and not to existing sites where a plant has already been located; it should not result in an appealable decision; and it should not require 'at least three alternative sites' at least two of which must be found acceptable (Sec. 25503 and Sec. 25516). These provisions lengthen the siting process unduly and are not necessary for environmental protection or adequate public review. . . ."

As the appellate court stated in *Public Utilities Com.* v. *Energy Resources Conservation & Dev. Com.*, *supra*, 150 Cal.App.3d at page 450, "We consider it significant that the critical amendment changing the limits of the Energy Commission's jurisdiction [by adding section 25123's 50-megawatt increase test] was adopted on March 28, 1974, shortly after receipt of and in apparent response to this letter." (Fn. omitted.)

We conclude that the Energy Commission lacks modification jurisdiction over the repowering project.

## II

The Energy Commission contends that we must defer to its administrative interpretation of section 25500, and accept its finding that it has construction jurisdiction over the repowering project under the substantial evidence rule. We disagree with the Energy Commission's administrative deference and substantial evidence rule contentions for the reasons previously stated.

Turning to the words of the statute, we find that the Legislature has vested the Energy Commission with certification jurisdiction over the "construction of any facility" with a generating capacity of 50 megawatts or more. (§§ 25120, 25500.) The Act defines "construction" as "onsite work to install permanent equipment or structure for any facility." (§ 25105.)

Under the Energy Commission's interpretation of section 25500, the DWP's installation of two new 80-megawatt combustion turbines constitutes

the "construction" of a facility, since the repowered plant will have a generating capacity of 50 megawatts or more. ■ While a literal reading of section 25500 supports this construction, "[l]iteral construction should not prevail if is is contrary to the legislative intent apparent in the statute." (*Lungren* v. *Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299].) In this case, a literal reading of section 25500 which imposes construction jurisdiction would directly contradict the legislative intent apparent in section 25123 to limit the Energy Commission's jurisdiction to only those modifications of existing facilities which meet the 50-megawatt *increase* test.

Moreover, the Energy Commission's construction of section 25500 would read much if not all of section 25123's limiting provisions out of the Act. ". . . An interpretation that renders related provisions nugatory must be avoided [citation]; each sentence must be read not in isolation but in the light of the statutory scheme [citation]; and if a statute is amenable to two alternative interpretations, the one that leads to the more reasonable result will be followed [citation]." (*Lungren* v. *Deukmejian, supra,* 45 Cal.3d at p. 735.) We conclude that section 25500 must be read and harmonized with section 25123.

■ We agree with the DWP that its replacement of units 1 and 2 with two new combustion turbines, and its installation of two new heat recovery steam generators and other pieces of equipment, does not constitute the "construction" of a facility. Rather, it clearly constitutes the "modification" of an existing facility under section 25123, which states that "modification" "means any alteration, replacement, or improvement of equipment that results in a 50-megawatt or more *increase* in the electric generating capacity of an existing thermal powerplant . . . ." (§ 25123, italics added.)

We hold that "construction" as used in section 25500 refers only to new, not existing, sites.

The Energy Commission relies heavily on the fact that the Act contains a "grandfather" clause which exempted from the Act's provisions any site and related facility "[f]or which construction is planned to commence within three years from the effective date of this division." (§ 25501, subd. (b).) Without the benefit of authority, the Energy Commission reasons that "[t]he existence of Sections 25501.5 and 25502.5 demonstrates that the Legislature intended the Commission to have 'construction' jurisdiction over powerplants that use existing equipment at existing sites: if the Commission did not have such jurisdiction, there would have been no need for the Legislature

to exempt many of the plants listed in Section 25501.5 and 25502.5. (The new plants would presumably not be subject to the Commission's 'modification' jurisdiction, because they would not constitute *alteration, replacement,* or *improvement* of equipment.' (See § 25123 (emphasis added).)[ ] There is nothing in the statute to indicate that the Legislature intended the 'construction' of such facilities to occur without Commission review."

The Energy Commission's reliance upon sections 25501.5[13] and

---

[13]Section 25501.5 states: "The Legislature finds and declares that the following proposed sites and facilities with the associated estimated generating capacities meet the requirements of subdivision (b) of Section 25501:

"(a) As designated in the report of the Pacific Gas and Electric Company submitted to the Public Utilities Commission on March 1, 1974, in response to Sections 2 and 3 of General Order 131 of the Public Utilities Commission, three gas turbine powerplants, each having a generating capacity of 52 megawatts commonly known as Potrero Unit 4, Potrero Unit 5 and Potrero Unit 6, to be located in the City and County of San Francisco; a gas turbine powerplant having a generating capacity of 52 megawatts, commonly known as Hunters Point Unit 1, to be located in the City and County of San Francisco; a gas turbine powerplant having a generating capacity of 200 megawatts, commonly known as Station C; a geothermal powerplant having a generating capacity of 106 megawatts, commonly known as Geysers Unit 12, to be located in Sonoma County; a geothermal powerplant having a generating capacity of 110 megawatts, commonly known as Geysers Unit 14, to be located in Sonoma County; a geothermal powerplant having a generating capacity of 55 megawatts, commonly known as Geysers Unit 15, to be located in Sonoma County; a geothermal powerplant having a generating capacity of 135 megawatts, commonly known as Geysers Unit 13, to be located in Lake County; a geothermal powerplant having a generating capacity of 110 megawatts, planned for operation in 1978, to be located in Sonoma County or Lake County; a geothermal powerplant having a generating capacity of 110 megawatts, planned for operation in 1979, to be located in Sonoma County of Lake County; a combined-cycle powerplant having a generating capacity of 800 megawatts, commonly known as Thermal 78, to be located in Contra Costa County near the City of Pittsburg; two combined-cycle powerplants, each having a generating capacity of 800 megawatts, commonly known as Thermal 79 and Thermal 81, to be located in Contra Costa county of [sic] Solano County; and a nuclear powerplant having a generating capacity of 1,100 megawatts, commonly known as Nuclear A to be located in Region 1, as shown on page 27 of the report of the Pacific Gas and Electric Company submitted March 1, 1974, in response to Sections 2 and 3 of General Order 131 of the Public Utilities Commission, or at the location commonly known as Diablo Canyon in San Luis Obispo County.

"(b) As described in the report of the Southern California Edison Company submitted to the Public Utilities Commission on March 8, 1974, in response to Sections 2 and 3 of General Order 131 of the Public Utilities Commission, two combined-cycle powerplants, each with a generating capacity of 236 megawatts, commonly known as Cool Water Unit 3 and Cool Water Unit 4, to be located in San Bernardino County; six combined-cycle powerplants, each having a generating capacity of 236 megawatts, commonly known as Huntington Beach Unit 6, Huntington Beach Unit 7, Huntington Beach Unit 8, Huntington Beach Unit 9, Huntington Beach Unit 10, and Huntington Beach Unit 11, to be located in the City of Huntington Beach; three combined-cycle powerplants, each with a generating capacity of 414 megawatts, commonly known as Lucerne Valley Unit 1, Lucerne Valley Unit 2, and Lucerne Valley Unit

25502.5[14] is misplaced. Despite the Energy Commission's contrary interpretation, we refuse to presume that the plants listed in those sections would not otherwise have been subject to the Commission's modification jurisdiction. Moreover, a bare reading of section 25501.5 indicates to us that since each of the listed facilities was scheduled to experience an *increase* in capacity above section 25123's 50-megawatt threshold limit, they thus would have fallen under the Energy Commission's modification jurisdiction but for the

---

3, to be located in San Bernardino County; and two nuclear powerplants, each having a generating capacity of 760 megawatts, commonly known as the Desert Nuclear Project.

"(c) As described in the report of the San Diego Gas and Electric Company submitted to the Public Utilities Commission on March 22, 1974, in response to Sections 2 and 3 of General Order 131 of the Public Utilities Commission, two gas turbine powerplants, each having a generating capacity of 64 megawatts, commonly known as South Bay Gas Turbine Unit 3 and South Bay Gas Turbine Unit 4, to be located in San Diego County; a fossil-fueled powerplant having a generating capacity of 292 megawatts, commonly known as Encina Unit 5, to be located in San Diego County; a combined-cycle powerplant having a generating capacity of 404 megawatts, planned for operation in 1979, to be located in San Diego County; and a nuclear powerplant having a generating capacity of 1,200 megawatts, commonly known as the Desert Nuclear Project, to be located in Riverside County.

"(d) As described in the report of the Pacific Gas and Electric Company to the Public Utilities Commission submitted March 1, 1974, in response to Sections 2 and 3 of the General Order 131 of the Public Utilities Commission, as gas turbine powerplant having a generating capacity of 150 megawatts, commonly known as SMUD Gas Turbines, to be located in Sacramento County; and a nuclear powerplant having a generating capacity of 1,100 megawatts, commonly known as Rancho Seco Unit 2, to be located in Sacramento County.

"(e) As described in the report of the Department of Water and Power of the City of Los Angeles submitted to the Public Utilities Commission on March 18, 1974, in response to Sections 2 and 3 of General Order 131 of the Public Utilities Commission, a nuclear powerplant having a generating capacity of 1,300 megawatts, commonly known as the San Joaquin Nuclear Project, to be located in Kern County near the City of Wasco.

"(f) Four geothermal powerplants, each having a generating capacity of 55 megawatts, presently planned to be constructed by the City of Burbank and to be located in Imperial County.

"(g) Four geothermal powerplants, each having a generating capacity of 55 megawatts, presently planned to be constructed by the City of Burbank and to be located in Inyo County.

"(h) Two geothermal powerplants, each having a generating capacity of 110 megawatts, presently planned to be constructed by the Northern California Power Agency and located in Sonoma County.

"Nothing in this section shall be construed to indicate that the sites and facilities specified in this section are approved by the Legislature. The inclusion of any site and related facility in this section means that the provisions of this chapter do not apply to any such site or facility, to the extent that Section 25501.7 or 25502.3 is made applicable, and that such site and related facility is subject to any and all other provisions of law."

[14]Section 25502.5 states: "The notice is not required to contain three alternative sites and related facilities for additional generating facilities on land owned by an electric utility before the effective date of this division at existing sites east of the town of Clay Station in Sacramento County, in the location commonly known as Diablo Canyon in San Luis Obispo County, and near the City of Pittsburg in Contra Costa County."

statutory exemption. Accordingly, sections 25501.5 and 25502.5 do not demonstrate that the Legislature intended to give the Energy Commission construction jurisdiction over all repowered plants that use existing equipment at existing sites with a capacity of 50 megawatts or more. Jurisdiction exists under sections 25500 and 25123, read together, only when the modification results in a 50-megawatt net increase in the station's total existing capacity.

We conclude that the Energy Commission lacks construction jurisdiction over the repowering project. Since the repowering project is not "construction" of a new facility and is not a "modification" that will result in a 50-megawatt or more *increase* in the station's generating capacity, the Energy Commission has no certification jurisdiction over the repowering project.

In view of our holding, we decline to address the DWP's contentions based on the charter city doctrine and the Energy Commission's failure to establish regulatory guidelines. The Energy Commission's prior practice of deciding these modification and construction jurisdiction issues on an ad hoc basis should no longer pose a problem to municipalities upon the finality of this opinion.

### DISPOSITION

We affirm the judgment. The DWP is entitled to recover its costs on appeal.

Spencer, P. J., and Devich, J., concurred.

Appellant's petition for review by the Supreme Court was denied March 19, 1992.