[No. B083493. Second Dist., Div. Four. Mar. 6, 1996.]

MICHELLE CAMPBELL, Plaintiff and Appellant, v.
ARCO MARINE, INC., et al., Defendants and Respondents.

**COUNSEL**

Rothner, Segall & Bahan, Anthony R. Segall, Della Bahan and Susan P. Ortmeyer for Plaintiff and Appellant.

Gartner & Young, Naomi Young, Mark E. Goldsmith and Lynne E. Thompson for Defendants and Respondents.

**OPINION**

**VOGEL (C. S.), P. J.**—This case presents the question of whether to construe the California Fair Employment and Housing Act to cover the sexual harassment claims of an employee of a California-based company who is not herself a resident of California, whose employment duties were performed, for the most part, outside the boundaries of the state, and whose injuries are based on behavior occurring outside the state. We hold that the Fair Employment and Housing Act was not intended to apply to nonresidents where, as here, the tortious conduct took place out of this state's territorial boundaries.

### FACTUAL BACKGROUND

Appellant Michelle Campbell is, and was at all relevant times, a resident of the State of Washington. In July of 1989, she applied through the mail for a position with respondent Arco Marine, Inc. (AMI). AMI is engaged in the transportation of crude oil by sea from Alaska to various points in the States of Washington and California. It is headquartered in Long Beach, California. Appellant was hired to serve aboard its ships as a "Utility II." A Utility II serves food, tends sanitation, and cleans officers' rooms, among other activities. The direct supervisor of this position is the chief steward who also prepares all performance evaluations. The job was offered to appellant by way of a telephone call made to her home in Washington. Appellant flew to Long Beach to join the assigned vessel, which immediately put out to sea.

Before beginning her first tour of duty, appellant was orally advised that no sexual harassment was allowed and that complaints in this regard should be referred to the captain or to the employee relations department in Long Beach. During two later tours, appellant served with Second Mate Charles

David Campbell,[1] once aboard the ARCO Texas from April 20, 1990, to July 5, 1990, and another time aboard the Sag River from March 4, 1991, to March 16, 1991. Campbell was not appellant's direct supervisor, although as a Utility II, she was expected to obey orders from all officers. Moreover, appellant contends she occasionally performed the function of a Utility I when on the ARCO Texas, which position was under the direct supervision of the second mate. As second mate, Campbell had no authority to promote, demote, or discipline employees.

Campbell had a history of temper flare-ups documented in written performance evaluations from the early 1980's. In the last documented incident, which occurred in 1987, he lost his temper with a female security guard (not a fellow employee) and made a number of derogatory, gender-specific comments to her. On that occasion he received a written reprimand which requested that he come in to obtain counseling, and stated: "Any repetition of this incident will result in disciplinary action, up to and including termination."

Appellant contends that while she was serving with Campbell, he created a hostile work environment through gender-specific insults and constant references to sexual matters. Often, this was in the context of conversations directed toward groups of employees. In addition, appellant described six incidents in which remarks were directed toward her. The first occurred while they were on board the ARCO Texas in 1990. Campbell approached appellant and another female Utility II while they were on duty and asked if they wanted to smell his wife's underwear. Subsequently, Campbell berated appellant under the erroneous impression that she had not reported an approaching ship while she was on bow watch. During a later conversation, he told her he did not like women on deck. Appellant did not lodge a formal complaint about the sexual or gender-related conversations. She did, however, informally discuss with the union representative the bow watch incident.

Appellant had no contact with Campbell between July of 1990 and March of 1991. In March of 1991, appellant was assigned to the Sag River, where she served with him again. On March 13, Campbell related a story to her about a sexual encounter between a seaman and one of her friends. Later, Campbell flew into a rage when she asked a joking question about his fidelity and said he never "fucked" anyone but his wife. Appellant reported these incidents the next day to the captain, Michael Dindio, who had not

---

[1] Although he bears the same last name, Charles David Campbell is no relation to appellant. All references to "Campbell" in this opinion are to Charles David Campbell.

been formally trained in how to deal with sexual harassment. As it so happened, Captain Dindio had heard the sexual encounter story and already chastised Campbell for telling it. After hearing appellant's complaint, he further instructed Campbell to stay away from her for the rest of the voyage.

Disregarding this instruction, Campbell accosted appellant while the crew was on shore leave in Port Angeles, Washington, and accused her of reading his mail. He had earlier been told by another crew member that appellant was taking the opportunity to go through his mail when she cleaned his cabin—a charge appellant denies. In the course of this tirade, he called appellant a "fat cow," "fat hog," and "fat bitch."

Appellant brought this final incident to Captain Dindio's attention. Captain Dindio issued a written warning to Campbell and decided without consultation with anyone else at AMI to remove both parties from the ship. He was informed by AMI's fleet staffing department that it would be difficult to find a second mate to replace Campbell. Ships are required by Coast Guard rule to have a second mate on board while at sea. Consequently, Campbell was permitted to remain on board one week after appellant was sent back home, which she contends created the misapprehension among the crew that she was in the wrong. Appellant continued to be paid her regular salary and was subsequently assigned to another ship. AMI commenced an investigation of appellant's complaint and terminated Campbell in April.[2]

Appellant filed a claim against AMI and its parent corporation, respondent Atlantic-Richfield Company (ARCO), for sexual harassment under the Fair Employment and Housing Act (Gov. Code, § 12900 et seq., hereinafter FEHA) and defamation. Respondents moved for summary judgment on several grounds. Primarily, they contended that the California Legislature did not intend the FEHA to apply to acts directed toward citizens of other states occurring outside of the boundaries of California. Respondents argued that application of the FEHA to such situations would constitute an extra-territorial exercise of power by the State of California in violation of the United States Constitution. In the alternative, they argued that Campbell was not an "agent" or "supervisor" within the definition of the FEHA, and that his employer was therefore not liable for his acts because it did not know and had no reason to know of his behavior toward appellant at the time and took appropriate corrective action when the inappropriate behavior was

---

[2]Campbell filed a grievance under his union's contract with AMI and AMI was subsequently forced to rehire him subject to a 30-day suspension without pay. As far as can be ascertained from the record, appellant is still employed by AMI and has not worked with Campbell again.

brought to its attention.[3] Respondents also contended that the harassment was based on personal animosity, not gender, and that the incidents were too isolated in the context of appellant's years of employment with AMI to form the basis for a "hostile environment" claim. ARCO individually sought judgment on the ground that as a separate and distinct corporation, it had no liability for the acts of AMI or its employees.

The trial court resolved the first issue in respondents' favor, concluding that the statute was intended to protect California residents only. The court granted summary adjudication on the FEHA cause of action, leaving the defamation claim intact. Appellant voluntarily dismissed the defamation claim and brought this appeal. On appeal, appellant contends that the statute was erroneously interpreted, that the Legislature intended the FEHA to apply to nonresidents whenever they were employed by California-based employers, and that application of the FEHA in this instance would not violate the constitutional prohibitions on extraterritorial state regulation.

I

Because the appropriate standard of review is disputed by the parties, we first address that issue. ■ Respondents suggest that a grant of summary judgment is reviewed under the standard applicable to abuse of discretion. This is incorrect. A trial court's grant of a motion for summary judgment is reviewed de novo by the appellate court. (*Ann M.* v. *Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666, 673-674 [25 Cal.Rptr.2d 137, 863 P.2d 207]; *Krieger* v. *Nick Alexander Imports, Inc.* (1991) 234 Cal.App.3d 205, 212 [285 Cal.Rptr. 717].) In addition, the trial court's determination in this case turned on its interpretation of state law. "Issues of statutory construction present questions of law, calling for an independent review by an appellate court. [Citations.]" (*Botello* v. *Shell Oil Co.* (1991) 229 Cal.App.3d 1130, 1134 [280 Cal.Rptr. 535].)

II

Turning to the question of statutory interpretation, the applicable provision of the FEHA, Government Code section 12940, makes it unlawful "[f]or an employer, labor organization, employment agency, apprenticeship

---

[3]Under the FEHA, harassment by an employee "other than an agent or supervisor" is unlawful only if "the entity, or its agents or supervisors, knows or should have known of this conduct and fails to take immediate and appropriate corrective action." (Gov. Code, § 12940, subd. (h)(1).)

training program or any training program leading to employment, or any other person" to harass an employee or applicant "because of race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, marital status, sex, or age . . . ." (Gov. Code, § 12940, subd. (h)(1).) For purposes of this subdivision, "employer" is defined as "any person regularly employing one or more persons, or any person acting as an agent of an employer, directly or indirectly, the state, or any political or civil subdivision thereof, and cities." (Gov. Code, § 12940, subd. (h)(3)(A).) "Employee" is not defined although the statute expressly excludes certain groups from the scope of that term. (Gov. Code, § 12926, subd. (c).) "Person" is defined generally to include "one or more individuals, partnerships, associations, corporations, limited liability companies, legal representatives, trustees, trustees in bankruptcy, and receivers or other fiduciaries." (Gov. Code, § 12925, subd. (d).) Under section 12960, "[a]ny person claiming to be aggrieved by an alleged unlawful practice may file with the department a verified complaint . . . ." (Gov. Code, § 12960.) If the department does not take action, it is to give notice that ". . . the person claiming to be aggrieved may bring a civil action under this part against the person, employer, labor organization or employment agency named in the verified complaint . . . ."[4] (Gov. Code, § 12965, subd. (b).) We are called on to determine whether these provisions should be construed to apply to appellant here, a nonresident whose job functions were performed almost entirely out of state.

 The cardinal rule governing statutory interpretation is to "ascertain the legislative intent so as to effectuate the purpose of the law. [Citations.]" (*Botello* v. *Shell Oil Co.*, *supra*, 229 Cal.App.3d at p. 1134.) "If the statutory language is unambiguous, legislative intent is determined from the plain meaning of the language itself. [Citations.]" (*Id.* at p. 1135.) On its face, the applicable provisions are ambiguous. They do not specifically state that the "aggrieved person" must be a citizen or resident of California. Nor do they say that the law will be applicable to noncitizens.

Neither party brings to our attention any California authority to resolve this issue, and we have found none. Appellant primarily relies on a Washington decision, *Burnside* v. *Simpson Paper Co.* (1992) 66 Wn.App. 510 [832

---

[4]The statute goes on to state that "[t]he superior, municipal, and justice courts of the State of California shall have jurisdiction of those actions, and the aggrieved person may file in any of these courts. Such an action may be brought in any county in the state in which the unlawful practice is alleged to have been committed, in the county in which the records relevant to the practice are maintained and administered, or in the county in which the aggrieved person would have worked . . . but for the alleged unlawful practice, but if the defendant is not found within any of these counties an action may be brought within the county of defendant's residence or principal office." (Gov. Code, § 12965, subd. (b).)

P.2d 537], affirmed 123 Wn.2d 93 [864 P.2d 937]. In *Burnside*, a Washington resident, employed in Washington for 16 years, was asked to relocate to San Francisco by his employer, a Washington corporation headquartered in California. He did so, but also maintained a home in Washington where his wife continued to reside. A year later, he was terminated based on some unconfirmed reports concerning his behavior during a business trip to Japan. He immediately moved back to Washington and there filed an age discrimination lawsuit under Washington law. The Washington version of the FEHA provided that it was "an exercise of the police power of the state for the protection of the public welfare, health, and peace of the people of this state, and in fulfillment of the provisions of the Constitution of this state concerning civil rights." (66 Wn.App. at p. 517 [832 P.2d at p. 542], quoting Wn. Rev. Code § 49.60.010.) Under the heading "Purpose of Chapter," the statute went on to state: "The legislature hereby finds and declares that practices of discrimination against any of its inhabitants because of race, creed, color, national origin, sex, marital status, age, or the presence of any sensory, mental, or physical handicap are a matter of state concern, that such discrimination threatens not only the rights and proper privileges of its inhabitants but menaces the institutions and foundation of a free democratic state." (*Ibid.*) Based on the reference to "inhabitants," defendants argued that the court lacked jurisdiction over claims brought by a nonresident. The court held that since the statute did not specifically limit its application to residents, it would not construe the statute to be so limited, the legislature's statement of purpose notwithstanding. (66 Wn.App. at pp. 518-519 [832 P.2d at pp. 542-543].)

Respondents, for their part, rely on *EEOC* v. *Arabian American Oil Co.* (1991) 499 U.S. 244 [113 L.Ed.2d 274, 111 S.Ct. 1227], a United States Supreme Court decision interpreting title VII of the Civil Rights Act of 1964. Plaintiff there was a naturalized American citizen of Lebanese descent working in Saudi Arabia for a Delaware corporation. He contended he had been discriminated against because of his race, religion, and national origin. The federal district court ruled that it lacked subject matter jurisdiction because title VII's protections did not extend to United States citizens employed abroad. On appeal, plaintiff argued that title VII's "broad jurisdictional language" revealed Congress's intent to extend the statute's protections to employment discrimination anywhere in the world by a United States employer affecting trade " 'between a State and any place outside thereof.' " (499 U.S. at p. 249 [113 L.Ed.2d at p. 283].) The Supreme Court disagreed, pointing out that: "If petitioners are correct . . . , we see no way of distinguishing in [title VII's] application between United States employers and foreign employers. Thus, a French employer of a United States citizen in France would be subject to Title VII—a result at which even

petitioners balk. The EEOC assures us that in its view the term 'employer' means only 'American employer,' but there is no such distinction in this statute and no indication that the EEOC in the normal course of its administration had produced a reasoned basis for such a distinction. Without clearer evidence of congressional intent to do so . . . , we are unwilling to ascribe to that body a policy which would raise difficult issues of international law by imposing this country's employment-discrimination regime upon foreign corporations operating in foreign commerce." (*Id.* at p. 255 [113 L.Ed.2d at p. 286].)

With due regard for the courts of the State of Washington, we believe our situation is closer to that faced by the Supreme Court in *Arabian American Oil Co.* than by the court in *Burnside*. Unlike the plaintiff in *Burnside*, appellant is now and has consistently been a resident of another state. She applied for the position with AMI and was hired while living in Washington. Except for occasional brief stopovers in California and other West Coast ports, her official functions were performed on the high seas. The harassment of which she complains took place while the ships were at sea except for one incident which occurred in the State of Washington. The relationship with California is slight. AMI is headquartered here but no one in its headquarters participated in or ratified the conduct. Captain Dindio made the decision to put appellant off the ship while allowing her oppressor to stay aboard until a replacement could be found without input from corporate headquarters. The most that can be said is that the decision concerning how to discipline Campbell for his prior outbursts and the 1987 incident involving the female security guard was either made or ratified in Long Beach.

Applying the FEHA in this situation would raise serious constitutional concerns. "The Commerce Clause . . . precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State." (*Edgar* v. *MITE Corp.* (1982) 457 U.S. 624, 642-643 [73 L.Ed.2d 269, 283, 102 S.Ct. 2629] (plur. opn.).) In addition, both the due process clause and full faith and credit clause are implicated when a state seeks to impose its laws where there are no significant contacts or aggregation of contacts creating state interests. (*Allstate Ins. Co.* v. *Hague* (1981) 449 U.S. 302, 312-313 [66 L.Ed.2d 521, 530-531, 101 S.Ct. 633] (plur. opn.).) "In deciding constitutional choice-of-law questions, whether under the Due Process Clause or the Full Faith and Credit Clause, [the Supreme] Court has traditionally examined the contacts of the State, whose law was applied, with the parties and with the occurrence or transaction giving rise to the litigation. [Citation.] In order to ensure that the choice of law is neither arbitrary nor fundamentally unfair, [citation], the Court has invalidated the choice of law of a State which has had no

significant contact or significant aggregation of contacts, creating state interests, with the parties and the occurrence or transaction." (449 U.S. at p. 308 [66 L.Ed.2d at pp. 527-528], fns. omitted.)

Read literally, the FEHA imposes no residency requirement on either the employer or the person aggrieved and no limitation based on where the conduct occurred. Since the Legislature certainly did not intend to interfere with employment relationships between residents of other states being performed wholly in other states, the broad statutory definitions of "employer" and "person" cannot in themselves be controlling. At some point, a line must be drawn between those situations where the law applies and those where it does not. Appellant would have the law applied to all California-based employers regardless of where the aggrieved employee resides and regardless of where the tortious conduct took place. We reject that view. To paraphrase the Supreme Court, if we were to accept appellant's view, we would have no logical basis for distinguishing between a nonresident working for a California corporation outside the state and a nonresident working for a foreign corporation outside the state. Without clearer evidence of legislative intent to do so than is contained in the language of the FEHA, we are unwilling to ascribe to that body a policy which would raise difficult issues of constitutional law by applying this state's employment-discrimination regime to nonresidents employed outside the state.

The evidence of legislative intent that exists supports our conclusion. The part of the FEHA relating to employment practices was enacted in 1959, at which time it was known as the Fair Employment Practices Act. (Stats. 1959, ch. 121.) The definitions of "employer" and "person" have remained substantially the same since that time,[5] as has the description of who may file a complaint with the commission ("[a]ny person claiming to be aggrieved by an alleged unlawful employment practice"). (Stats. 1959, ch. 121, §§ 1413, subd. (a), 1413, subd. (d), 1422, pp. 2000, 2003.) In the "Findings and Declarations of Policy," codified with slightly different language in Government Code section 12920, the Legislature specifically stated: "This part shall be deemed an exercise of the police power of the State for the protection of the public welfare, prosperity, health, and peace of *the people of the State of California.*" (Stats. 1959, ch. 121, § 1411, p. 2000, italics

[5]For purposes of subdivision (h) of Government Code section 12940, the provision dealing with harassment, the definition of employer was amended so that it would apply to "any person regularly employing *one* or more persons . . . ." The original definition of employer, and the definition still applicable to all other unlawful conduct under the FEHA, is "any person regularly employing five or more persons, or any person acting as an agent of an employer, directly or indirectly; the state or any political or civil subdivision thereof and cities . . . ." (Gov. Code, § 12926, subd. (d).)

added.) Subsequently, in 1984, the Legislature further indicated its intent to restrict the scope of the act when it stated preliminary to amending section 12940: "The Legislature finds and declares that it is the existing policy of the State of California to prohibit harassment and discrimination in employment on the basis of any protected classification. Such conduct whether intentional or unintentional is a violation of the civil rights of *California citizenry* . . . ." (Stats. 1984, ch. 1754, § 1, p. 6403, italics added.)

"A court is, of course, obliged to construe the statute according to the Legislature's own statement of its purpose if it can. [Citations.]" (*Botello* v. *Shell Oil Co.*, *supra*, 229 Cal.App.3d at p. 1135.) The repeated statements that the law was enacted for the benefit of the citizenry of this state is persuasive indication of the Legislature's intent concerning the applicability of the FEHA. Our reading of the Legislature's statement of purpose leads us to agree with respondents that it should not be construed to apply to nonresidents employed outside the state when the tortious conduct did not occur in California.

## III

██ In an argument not advanced before the trial court, appellant urges that we defer to "long-standing administrati[ve] interpretation of the statute" of the Department of Fair Employment and Housing, the agency authorized to adopt rules and regulation to carry out the function of the FEHA. In support, appellant appends to her brief a 1987 memorandum from the deputy director of the enforcement division to "All Holders of Directives Manuals," a document not part of the record on appeal.

An agency's interpretation which is found in an internal memorandum, "rather than in an administrative regulation which might be subject to the notice and hearing requirements of proper administrative procedure," is entitled to very slight deference. (*Jones* v. *Tracy School Dist.* (1980) 27 Cal.3d 99, 107 [165 Cal.Rptr. 100, 611 P.2d 441].) Moreover, a construction of a statute that is not contemporaneous with its enactment, but undertaken years after the fact, "is not entitled to great weight. [Citation.]" (*Department of Water & Power* v. *Energy Resources Conservation & Development Com.* (1991) 2 Cal.App.4th 206, 220 [3 Cal.Rptr.2d 289].) As we have said, the FEHA was enacted in 1959. (Stats. 1959, ch. 121.) The memorandum was written nearly 30 years later.

Nor does the memorandum speak directly to the issue. It states that the department will accept complaints "where *the act of harm occurred outside*

of California if there is a potential for establishing a connection between that act and some action of the respondent within California." It does not state that it will accept complaints from nonresidents where the act of harm occurred outside of California. Because the memorandum was prepared long after the statute's enactment, was the subject of an informal, internal policy decision, and is itself ambiguous, we do not find it persuasive.

### DISPOSITION

The judgment is affirmed.

Epstein, J., and Rubin, J.,* concurred.

---

*Judge of the Munipical Court for the Santa Monica Judicial District sitting under assignment by the Chairperson of the Judicial Council.